## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **WALTER LLOYD BLAIR** | * | |
| | * | |
| Petitioner | * | |
| | * | |
| **v.** | * | Civil No. **PJM 14-766** |
| | * | Crim. No. **PJM 08-0505** |
| | * | |
| **USA – 2255** | * | |
| | * | |
| Respondent | * | |

## MEMORANDUM OPINION

Walter Lloyd Blair has filed a Motion to Vacate, Set Aside, or Correct his Sentence under 28 U.S.C. § 2255, claiming that both his trial and appellate counsel were constitutionally ineffective, resulting in the denial of his Sixth Amendment rights. Pet'r's Mot. Vacate, ECF No. 255. The Government counters that, in every respect, Blair has failed to make out a claim under *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  The Court agrees with the Government. For the reasons that follow, the Court will **DENY** Blair's Motion.[1]

### I.

### Factual and Procedural Background

In August 2003 in Richmond, Virginia, Elizabeth Nicely purchased a Cadillac Escalade automobile in her own name. She did so, however, for Anthony Rankine, a known drug dealer,

---

[1] Blair has also filed Motions for Discovery, ECF No. 256, for Witnesses to Appear at an Evidentiary Hearing, ECF No. 257, and for a 48 hour Furlough to Appear or to Appear via TV Monitor, ECF No. 258. All of these Motions will also be **DENIED**, as further discussed in Part V of this Opinion.

who supplied the down payment and promised to pay off the purchase money loan for the car.[2] Rankine conducted a large marijuana distribution operation in the Richmond area, where he regularly received 500-pound crates of marijuana, which he paid for in cash rubber-banded in $1,000 stacks.  Soon after the Escalade was purchased, Nicely agreed to store a safe belonging to Rankine in her house in Richmond, without having any access to the contents of the safe herself, even though she knew Rankine was a drug dealer. A short time later, Rankine's girlfriend—not Nicely—was murdered, and Rankine went missing. Rankine, too, was eventually found murdered.  At that point, Nicely realized she was in possession of a safe that almost certainly contained drug money and that she could be in danger. She therefore undertook to move the safe to a storage facility.  In fact, Nicely soon did begin to receive threatening phone calls about the money in the safe, which led her to contact a coworker, Michael Henry, for advice on how to handle the situation. Henry told Nicely she needed to speak with a criminal defense attorney and shortly thereafter the two of them were referred to Walter Blair, Esquire, a criminal defense attorney, whose principal office was in Silver Spring, Montgomery County, Maryland.  Rankine, Nicely, Henry, and Blair as it happened, were all originally from Jamaica.

On November 4, 2003, Blair received a phone call from Nicely explaining that she was in possession of a safe she believed contained drug money belonging to a known drug trafficker, Anthony Rankine. Later that day, Nicely and Henry met with Blair at his office in Silver Spring, at which Nicely repeated that she had a safe containing Rankine's drug proceeds, and showed Blair online media coverage indicating that Rankine's disappearance and his girlfriend's murder were connected to a Jamaican drug ring.  Blair requested that they open the safe, which was still

---

[2] These facts are summarized by the U.S. Court of Appeals for the Fourth Circuit in *United States v. Blair*, 661 F.3d 755, 755-63 (4th Cir. 2011).

in Richmond, and bring back the contents to his office in Silver Spring. Nicely also told Blair that she had purchased an Escalade automobile for Rankine under her name.

Nicely and Henry emptied the safe without counting the money and, on November 6, brought it in a duffle bag back to Blair's office in Silver Spring. Blair and Henry proceeded to count approximately $170,000 in cash taken from the duffle bag, but did so without Nicely in the room so as to "protect her." However, Blair thereafter told Nicely there was only about $70,000 in the bag. Blair also created a cover story for both Nicely and Henry involving the Jamaican custom known as "partner money" with which both Nicely and Henry were familiar.[3] Blair then proceeded to set up a real estate corporation for Nicely, which he called "Jay Paul Property Management," and enlisted Vassel Clarke, a mortgage broker, to purchase real estate on behalf of Nicely.

On November 7, 2003, Nicely opened two bank accounts into which she deposited some, but not all, of the money from the duffle bag. When Blair found himself unable to open a business account for Nicely's corporation, he instead opened an account in the name of his law firm, Blair and Lee, P.C., depositing $6,000 in the account, and retaining an additional $1,000 for himself as a fee for setting up the corporation.  A few days later, Blair gave Clarke an additional $31,000 from the duffle bag to purchase real estate for Nicely. Clarke, on Nicely's behalf, eventually purchased a house in Washington, D.C., and other real property in Maryland.

After learning of Rankine's death—but before she contacted Blair—Nicely had received a phone call from one of Rankine's associates, Dashawn Saunders, asking for permission to retrieve the Escalade from an automotive shop in Richmond. Nicely gave him permission to do

---

[3] "Partner money" involves an asset-pooling arrangement that allows people to obtain substantial funds they would otherwise not have access to through a traditional lending institution. By means of this informal lending mechanism, each partner contributes a certain amount to the pool, and the "banker" divides the pool among the partners until each has received his or her needed draw.

this, but when Saunders arrived at the shop, he was arrested on drug trafficking charges. The Escalade was found to contain $42,000 in drug proceeds that Saunders had previously received. Richard Bernard, an associate of Saunders, was also arrested on drug charges in Virginia.

During Nicely's initial meeting with Blair on November 4, 2003, she expressed concern that she had been getting troubling phone calls; in one, she stated, someone told her that Saunders needed the drug money for his legal defense.  On November 6, 2003, Blair retained Virginia attorneys David Boone, Esquire, and James Yoffy, Esquire, to represent Saunders and Bernard, both of whom were under arrest on federal drug conspiracy charges. To compensate the two Virginia attorneys, Blair used cash from the duffle bag Nicely and Henry had brought him to purchase three separate $10,000 cashier's checks—one for each lawyer and one for Blair himself as co-counsel for Saunders. Blair also set aside money to retrieve the Escalade Nicely had purchased for Rankine.

On November 12, 2003, the FBI contacted Nicely in regard to the Escalade, which by then had been linked to the drug traffickers. Nicely answered none of their questions, but referred the agents to Blair. Nicely then went to Blair's office to discuss how she should handle questions from the FBI. Blair instructed her to only discuss the Escalade, and that she should never mention the money from the safe. Blair tape recorded Nicely rehearsing what she would say to the FBI. The following day, Blair provided Nicely with a letter she was supposed to memorize, which detailed the "partner money" story and indicated that Nicely was only involved in paying legal fees for Saunders and Bernard because they were her relatives.  Nicely was not, in fact, related to either individual.

On November 17, 2003, Blair sought admission *pro hac vice* to represent Saunders in the United States District Court for the Eastern District of Virginia in the matter of *United States v.*

*Philip Jazir Thompson*, Crim. No. JRS-03-420.[4] Blair represented to the court that he had never been reprimanded by any court. This was not true. Not only had Blair been previously reprimanded; the West Virginia Supreme Court of Appeals had suspended his license to practice for witness tampering. Blair's application for admission to the Virginia federal court was granted, but he did not thereafter make an appearance in that court.

On November 5, 2008, Blair was charged in an indictment in this Court with fourteen counts of criminal activity, including money laundering, witness tampering, obstruction of justice, making false statements, and failing to file income tax returns. Indictment, ECF No. 1. At his trial, he was represented by David Williams, Esquire. Entry of Appearance at 1, ECF No. 142. At the conclusion of the trial, the jury convicted Blair of eight counts of money laundering under 18 U.S.C. § 1956 (Counts One through Eight); one count of money laundering under 18 U.S.C. § 1957 (Count Nine); one count of witness tampering under 18 U.S.C. § 1512 (Count Ten); one count of obstructing justice under 18 U.S.C. §1503(a) (Count Eleven); one count of making a false statement under 18 U.S.C. § 1001(a)(2) (Count Twelve); and two counts of failing to file an income tax return under 26 U.S.C. § 7203 (Counts Thirteen and Fourteen). Verdict Form at 1-4, ECF No. 165.

At his sentencing on April 23, 2010, Blair was represented by Eric Hans Kirchman, Esquire, and Kenneth Robinson, Esquire. Judgment and Commitment Order at 1, ECF No. 204. After hearing from the Government, defense counsel, and Blair, the Court sentenced Blair to ninety-seven months imprisonment on Counts One through Eleven, sixty months on Count Twelve, and twelve months on Counts Thirteen and Fourteen, all sentences to run concurrently. Judgment and Commitment Order at 4, ECF No. 204.

---

[4] According to the indictment in that case, Dashawn Andre Saunders was an alias for Philip Jazir Thompson.

On April 29, 2010, Blair, represented by Kirchman and Robinson, appealed his conviction and sentence to the U.S. Court of Appeals for the Fourth Circuit. Notice of Appeal at 1, ECF No. 203. Ultimately, the Fourth Circuit affirmed Blair's convictions on all counts but Count Eleven (Obstruction of Justice), which was reversed for insufficient evidence. *United States v. Blair*, 661 F.3d 755, 766-70 (4th Cir. 2011). The case was remanded to this Court for resentencing. *Id.* at 775. The Supreme Court thereafter denied Blair's petition for writ of certiorari. *Blair v. United States*, 132 S. Ct. 2740 (mem.), 183 L.Ed.2d. 615 (2012).

At Blair's resentencing before this Court on March 19, 2012, he again received a sentence of ninety-seven months imprisonment on the remaining viable counts, all the sentences to run concurrently. Am. J. at 4, ECF No. 242.  On March 28, 2012, Blair filed a second appeal, this time representing himself. Notice of Appeal at 1, ECF No. 244. On this second appeal, the Fourth Circuit affirmed this Court in full. *United States v. Blair*, 508 F. App'x 225, 1 (4th Cir. 2013). The Fourth Circuit reviewed Blair's arguments and concluded that all the challenges to his convictions and most of his sentencing claims were foreclosed by the mandate rule.[5] *Id.*  To the extent Blair's sentencing challenges were not barred by the mandate rule, the Fourth Circuit found no clear error in this Court's re-sentence. *Id.*

On March 13, 2014, Blair, still *pro se*, filed the present Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255, citing ineffective assistance of his trial counsel, Attorney Williams, and his appellate counsel, Attorneys Kirchman and Robinson, who also represented Blair at his original sentencing. Pet'r's Mot. Vacate, ECF No. 255. Blair has asserted thirty-two grounds which he claims denied him effective assistance of counsel at both the trial and appellate levels. His claims relate primarily to the testimony of Nicely and Henry regarding

---

[5] The mandate rule precludes "relitigation of issues expressly or impliedly decided by the appellate court," and "litigation of issues decided by the district court but foregone on appeal." *United States v. Bell*, 5 F.3d 64, 66 (4th Cir. 1993).

their lack of personal knowledge as to the provenance of the money in the safe Nicely received from Rankine and the testimony of Agent Judith Razetti who searched Blair's law office. He raises a number of other miscellaneous claims against both trial and appellate counsel.

The Government maintains that all of Blair's claims are meritless. Gov't Resp. Opp'n at 6, ECF No. 277. It asserts that the ten claims related to witnesses Nicely and Henry "amount to 'no more than second-guess[ing] counsel's assistance after conviction.'"  Gov't Resp. Opp'n at 7, ECF No. 277 (quoting *Harrington v. Richter*, 131 S. Ct. 770, 780 (2011)). As for the claims related to Agent Razetti, the Government argues that trial counsel attempted to do exactly what Blair now claims counsel failed to do, i.e. to impeach her credibility. Gov't Resp. Opp'n at 11, ECF No. 277.  Similarly, the Government maintains that all of Blair's claims against appellate counsel lack merit, arguing that counsel acted well within the wide range of reasonable professional conduct. *Id*. at 16.

## II.

### Legal Standard

Ineffective assistance of counsel claims are governed by the two-part test first elucidated by the Supreme Court in *Strickland v. Washington*:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. 668, 687 (1984).

These two elements are typically referred to as the "performance" and "prejudice" prongs. *See Fields v. Attorney Gen. of State of Md.*, 956 F.2d 1290, 1297 (4th Cir. 1992). Since a petitioner bears the burden of proving both *Strickland* elements, he fails to satisfy his overall burden if he fails to prove either. *Id.* Accordingly, the Court may properly begin its analysis with either the performance or the prejudice prong.

In the first prong, the defendant must show that the counsel's performance was deficient and fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 687-88. The objective standard of reasonableness is evaluated under "prevailing professional norms." *Sexton v. French*, 163 F.3d 874, 882 (4th Cir. 1998) (quoting *Strickland*, 466 U.S. at 688). Reasonableness must be evaluated "within the context of the circumstances at the time of the alleged errors." *Sexton*, 163 F.3d at 882 (citing *Strickland*, 466 U.S. at 690). To meet this burden, the defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 687). For example, counsel is not considered deficient for failing to anticipate changes in the law or for failing to pursue constitutional claims they reasonably believe to be of questionable merit. Strategic decisions and tactical judgments are "virtually unchallengeable." *Powell v. Kelly*, 562 F.3d 656, 670 (4th Cir. 2009) (quoting *Strickland*, 466 U.S. at 690). In assessing the first prong, the reviewing court operates with a presumption that counsel's performance was not deficient but instead falls within the broad scope of reasonable assistance. *See id.* (citing *Strickland*, 466 U.S. at 688).

In order to satisfy the prejudice prong, the defendant must show that there was a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. A "reasonable probability" is a

probability sufficient to undermine confidence in the outcome. *Id*. When challenging a conviction, the defendant must show that there is "a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Spencer v. Murray*, 18 F.3d 229, 233 (4th Cir. 1994) (quoting *Strickland*, 466 U.S. at 695). That said, a defendant need not go so far as to establish that "counsel's deficient conduct more likely than not altered the outcome of the case." *United States v. Rangel*, 781 F.3d 736, 742 (4th Cir. 2015) (quoting Strickland, 466 U.S. at 693). The *Strickland* standard also applies when evaluating claims of ineffective assistance of appellate counsel. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000) (citing *Strickland v. Washington*, 466 U.S. 668 (1984); *Smith v. Murray*, 477 U.S. 527, 535-536 (1986)). In applying *Strickland* to an appellate counsel's performance, the court must indulge the "presumption that [appellate counsel] decided which issues were most likely to afford relief on appeal." *Pruett v. Thompson*, 996 F.2d 1560, 1568 (4th Cir. 1993). Appellate counsel has no duty to "raise every nonfrivolous issue on appeal." *Griffin v. Aiken*, 775 F.2d 1226, 1235 (4th Cir. 1985) (citing *Jones v. Barnes*, 463 U.S. 745, 751-54 (1983)).

## III.

### Claims as to Trial Counsel[6]

**Claims Related to Elizabeth Nicely and Michael Henry**

Blair makes several claims of ineffective assistance of counsel in relation to the trial testimony of Elizabeth Nicely and Michael Henry, many of which relate to their lack of personal direct knowledge that the money in Rankine's safe was drug proceeds. By way of background, Nicely testified at trial that she told Blair there was drug money in the safe. Trial Tr. at 156:4-6, Dec. 3, 2009, ECF No. 195 ("We started to explain the situation to him, everything that was

---

[6] The Court will not be addressing Blair's claims in numerical sequence because numerically the claims often do not have a meaningful sequence. Instead, the Court has attempted to group the claims chronologically, which it believes will give greater clarity to Blair's arguments.

going on, including that we had a safe. There was drug money in the safe . . . ."). When asked specifically what she told Blair was in the safe, Nicely responded "I told him it was drug money, sir." Trial Tr. at 5:23, Dec. 4, 2009, ECF No. 196. Nicely further explained that while she did not have access to the safe, she recalled that Blair "told me that I need to go get the money out of the safe, and I told him I didn't have any key nor combination for this safe. He told me to go get a crow bar and open the safe." Trial Tr. at 160:20-22, Dec. 3, 2009, ECF No. 195. Henry similarly testified that "we knew it was drug money." Trial Tr. at 82:20, Dec. 3, 2009, ECF No. 195. On redirect examination, Henry once again asserted that he told Blair "[t]hat this was money from drug activity." Trial Tr. at 128:21, Dec. 3, 2009, ECF No. 195.

The Court considers four of Blair's claims—Claims 3, 4, 5, and 7—all relating to Nicely's and Henry's testimony regarding their knowledge that the money in the safe was "drug money."

In <u>Claim #4</u>, Blair alleges that his trial attorney was ineffective by failing to ask competent questions of both Nicely and Henry to expose their lack of personal knowledge that the money in the safe was drug money, as well as counsel's failure to request a mistrial when Nicely testified she paid Blair with drug money, despite her lack of personal knowledge that it was drug money. Pet'r's Mot. Vacate at 13-14, ECF No. 255; Pet'r's Reply at 9, ECF No. 278. The Government notes that the trial transcript reveals that Blair's trial counsel in fact did question Nicely and Henry about their lack of personal knowledge that the money was "drug money." *See* Gov't Resp. Opp'n at 8, ECF No. 277; Trial Tr. at 44-45, Dec. 4, 2009, ECF No. 196; Trial Tr. at 117-119, 123, 126, Dec. 3, 2009, ECF No. 195. Blair apparently takes issue with the "competency" of the questioning. Pet'r's Mot. Vacate at 13, ECF No. 255.

In <u>Claim #3</u>, Blair alleges that trial counsel was ineffective by failing to request a mistrial when Henry testified he knew the money from the safe was drug money. *See* Pet'r's Mot. Vacate at 12, ECF No. 255. The Government challenges Blair's narrative as inaccurate because the Court specifically instructed the jury to disregard the answer to the question unless the witness had personal knowledge. *See* Gov't Resp. Opp'n at 9-10, ECF No. 277. On redirect examination, the Government specifically asked Henry what he and Nicely told Blair. *See* Gov't Resp. Opp'n at 10, ECF No. 277; Trial Tr. at 81-82, 128, Dec. 3, 2009, ECF No. 195.

The record demonstrates that Blair's trial counsel conducted a more than adequate cross-examination of Nicely and Henry regarding their lack of personal knowledge that the money in the safe was "drug money."   *See* Trial Tr. at 45:2-3, Dec. 4, 2009, ECF No. 196 (when questioned whether she saw anyone put money in the safe, Nicely responded "I never seen put money in the safe."); Trial Tr. at 117:20-22, Dec. 3, 2009, ECF No. 195 (in response to the question "[d]id you ever see anyone put any drug money in the safe?" Henry answered "[n]o, I didn't, sir."); Trial Tr. at 126:18-20, Dec. 3, 2009, ECF No. 195 (when asked "[d]o you have any personal knowledge of Mr. Rankine putting any money into the safe?" Henry responded "[n]o I don't sir."). When evaluating trial counsel's performance, "the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." *Strickland v. Washington*, 466 U.S. 668, 690 (1984). By cross-examining the witnesses, Blair's trial counsel surely "[made] the adversarial testing process work." *Id*. Simply because counsel's questions did not lead the jury to discount witness testimony does not render counsel's performance unreasonable.

Similarly, Blair's trial counsel was reasonable in not requesting a mistrial related to Nicely's or Henry's statements about their personal knowledge that the safe contained drug

money. Requesting a mistrial is within the trial attorney's discretion: "[t]he Supreme Court has never suggested that decisions about mistrials . . . can be made only by the defendant himself, and every circuit to consider the question has concluded that decisions regarding mistrials belong to the attorney, not the client." *United States v. Chapman*, 593 F.3d 365, 368 (4th Cir. 2010) ("We likewise conclude that decisions regarding a mistrial are tactical decisions entrusted to the sound judgment of counsel, not the client."). In light of counsel's vigorous cross-examination of Nicely and Henry, the Court considers trial counsel's decision not to request a mistrial to have been sound trial strategy.  Further, the Court explicitly instructed the jury that "whoever is going to identify it as drug money has to have personal knowledge. This witness doesn't have personal knowledge at this point." Trial Tr. at 82:23-25, Dec. 3, 2009, ECF No. 195.   Blair cannot demonstrate that in this "counsel's performance fell below an objective standard of reasonableness under 'prevailing professional norms.'" *Sexton v. French*, 163 F.3d 874, 882 (4th Cir. 1998) (quoting *Strickland*, 466 U.S. at 688).

In Claim #5, Blair asserts that trial counsel was incompetent for not asking for a jury instruction based on Nicely's lack of personal knowledge about drug money. Pet'r's Mot. Vacate at 14-15, ECF No. 255; Pet'r's Reply at 9, ECF No. 278.  According to Blair, since all the counts in the case depended on the existence of "drug money," a jury instruction on that point would have resulted in an acquittal on all counts. Pet'r's Mot. Vacate at 14-15, ECF No. 255. Once again, the Government argues this claim lacks a factual basis because Blair's trial counsel consistently *did* attempt to challenge the basis of the witnesses' knowledge. *See* Gov't Resp. Opp'n at 7-8, ECF No. 277. The Government argues that Blair's claims amount to nothing more than second-guessing counsel's trial tactics. *Id*.

The Court agrees.

Apart from that, Blair has not shown that counsel's failure to request a jury instruction regarding Nicely's lack of personal knowledge that the money was drug money resulted in prejudice. Simply put, no jury instruction was warranted. Nicely did not testify that she had personal knowledge it was drug money, only what she understood the money to be and only what she told Blair she thought it was. Trial Tr. at 5:23, Dec. 4, 2009, ECF No. 196 ("I told him it was drug money, sir."); *See Roach v. Sizer*, No. CIV.A. RWT-07-1136, 2009 WL 2151716, at *7 (D. Md. Jul. 14, 2009) ("Since the evidence presented against Roach did not warrant a jury instruction on the 'heat of passion' defense, counsel cannot be ineffective for failing to request the instruction.").

It was also perfectly reasonable trial strategy for Blair's trial counsel to forego requesting a jury instruction and instead highlight Nicely's lack of personal knowledge during vigorous cross examination. A jury instruction as to Nicely's lack of personal knowledge might have reminded the jury of all the other evidence indicating that the money in fact was drug money. Unquestionably, there was ample other evidence to support that reasonable inference, wholly apart from Nicely's and Henry's testimony, including print-outs of Internet stories about the drug-related murders that were found in Blair's office, the criminal drug charges faced by the Virginia defendants for whom Blair personally retained counsel, and evidence showing that the money in the safe was packaged in the same way as the money found in Rankine's home and vehicle.[7] *See e.g.*, Trial Tr. at 158:22-159:7, Dec. 3, 2009, ECF No. 195 (The Court found that

---

[7] When Blair's trial counsel objected to Nicely's testimony that there was drug money in the safe, Assistant U.S. Attorney Michael Pauze noted that the Government had also "introduced evidence that there was, you know, drug money found in Mr. Rankine's house. It was packaged in the same exact fashion as the money that was given to the defendant." Trial Tr. at 159:1-3, Dec. 3, 2009, ECF No. 195. The Court then ruled that this evidence was admissible to show the money in the safe was drug money. *See* Trial Tr. at 159:4-7, Dec. 3, 2009, ECF No. 195.

there was separate proof beyond Nicely's testimony that the money was drug money, i.e., Nicely's "statement alone doesn't prove it was drug money but the other evidence would.").

In Claim #7, Blair states that trial counsel was ineffective for failing to argue, during both of counsel's two Motions for Judgment of Acquittal, that neither Nicely nor Henry had personal knowledge that Blair was paid with "drug money," because if counsel had done so, Blair would have been acquitted of all counts. *See* Pet'r's Mot. Vacate at 17-18, ECF No. 255. The Government again submits this claim is groundless because Blair's trial counsel in fact did try to impeach the witnesses' knowledge. *See* Gov't Resp. Opp'n at 8, ECF No. 277.

Blair's assertions in Claim #7 do not sustain a claim for relief under *Strickland*. Trial counsel did make a Motion for Judgment of Acquittal when the Government rested, specifically arguing that the Government's witnesses, especially Nicely, lacked personal knowledge to call the money Blair received "drug money." But the Court denied the motion. *See* Trial Tr. at 37:24-40:23, 43:21-44:4, Dec. 9, 2009, ECF No. 198. In fact, Blair's trial counsel made the same argument when he renewed his Motion for Judgment of Acquittal at the end of the defense case, and again the Court denied it. *See* Trial Tr. 13:16-15:2, Dec. 11, 2009, ECF No. 201. Claim #7 holds no water under *Strickland*. *See also Marshall v. United States*, 461 F. Supp. 2d 388, 396 (D. Md. 2006), *subsequent mandamus proceeding sub nom. In re Marshall*, 283 F. App'x 148 (4th Cir. 2008) (noting "[defense counsel] made the very argument that [the defendant] claims he did not make. [The defendant], therefore, cannot sustain this claim of ineffective assistance.").

In Claim #19, Blair shifts to Nicely's and Henry's testimony as to the *amount* of money they brought to him after opening the safe, arguing that trial counsel also failed to competently and effectively cross examine on this topic. *See* Pet'r's Mot. Vacate at 33-34, ECF No. 255. Blair submits that one of the witnesses was "in fact lying" and that the testimony of both witnesses

was "speculative." *Id.* The Government, however, points out that the jury was clearly made aware that the amount of money was "speculative" because both Nicely and Henry admitted on direct and cross examination that they never counted the money before bringing it to Blair; they left the duffle bag containing the money with Blair. *See* Gov't Resp. Opp'n at 10, ECF No. 277. [8]

Blair's counsel cross-examined Nicely and Henry so effectively that they in fact admitted precisely what Blair now asserts: they were unsure of the exact amount of money in the safe. *See* Trial Tr. at 116:20-21, Dec. 3, 2009, ECF No. 195 (When asked on cross if Henry had counted the money prior to giving it to Blair, he responds, "[n]o, I never counted it."). Witness examinations are a matter of trial tactics and strategy, which fall within the exclusive purview of the defense attorney. *See Mosley v. United States*, No. CIV. DKC 07-1520, 2011 WL 1230888, at *2 (D. Md. Mar. 29, 2011) ("As an initial matter, tactical decisions such as what questions to ask witnesses are 'virtually unchallengeable..'") (citing *Powell v. Kelly*, 562 F.3d 656, 670 (4th Cir. 2009). Further, the "failure of the strategy to produce an acquittal does not mean that it was incompetent." *Jackson v. United States*, 473 F. Supp. 2d 640, 646 (D. Md. 2006). Blair is unable to satisfy the deficiency prong of *Strickland* in light of the deferential presumption that the "challenged acts are likely the result of a sound trial strategy." *Spencer v. Murray*, 18 F.3d 229, 233 (4th Cir. 1994) (citing *Strickland*, 466 U.S. at 689).

In Claim #9, Blair argues that trial counsel was ineffective by failing to move to strike Counts One through Eight (18 U.S.C. § 1956(a)(1)(B)(i)) [9] and Count Nine (18 U.S.C. § 1957(a))

---

[8] Since Blair did not testify himself, there was no testimony in the record to challenge the veracity of these statements.

[9] Counts One through Eight were alleged violations of 18 U.S.C. § 1956(a)(1)(B)(i), which requires that:

> [w]hoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . knowing that the transaction

because both Nicely and Henry failed to demonstrate that they had personal knowledge that the money given to Blair was "drug money." *See* Pet'r's Mot. Vacate at 20, ECF No. 255; Pet'r's Reply at 14-15, ECF No. 278. The Government objects to Claim #9 altogether because these arguments were presented to and specifically rejected by the Fourth Circuit, which effectively found that the outcome of the proceedings would not have been different. *See* Gov't Resp. Opp'n at 10 n.5, 13 n.10, ECF No. 277 (citing *United States v Blair*, 661 F.3d 755, 764 (4th Cir. 2011)).

In any event, Nicely's or Henry's personal knowledge that the money Blair received was drug money was not necessary to prove Count One through Count Eight, (18 U.S.C. § 1956(a)(1)(B)(i)). *See* Pet'r's Reply at 15-16, ECF No. 278. "The statute requires only a showing that the <u>defendant</u> had knowledge that 'the property involved in a financial transaction represents the proceeds of *some form of illegal activity*.'" *United States v. Campbell*, 977 F.2d 854, 857 n.3 (4th Cir. 1992)(emphasis in original). In other words, the Government is only required to "show that the defendant possessed the *knowledge* that the transaction was designed to conceal illegal proceeds." *Campbell*, 977 F.2d at 857 )(emphasis in original).

The Government presented extensive evidence to sustain its burden that Blair knew that the money he received from Nicely derived from "some form of illegal activity." *See Campbell*, 977 F.2d at 857. In addition to Nicely's and Henry's testimony at trial that they *told* Blair the money was drug proceeds, as the Court has already noted, the Government presented evidence of print outs of several Internet news stories about the drug-related murders in Virginia found in the library of Blair's law office. The print-outs showed that they were made on November 13, 2003, the same day Blair's own records indicated that a telephone interview between Nicely and the

---

is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, or the ownership, or the control of the proceeds of specified unlawful activity.

18 U.S.C. § 1956(a)(1)(B)(i).

FBI was scheduled.[10] *See* Trial Tr. at 101:20-107:1, Dec. 4, 2009, ECF No. 196. Additionally, Henry testified that when he and Nicely visited Blair's office, they looked up these Internet articles on Blair's computer. *See* Trial Tr. at 80:17-81:14, Dec. 3, 2009, ECF No. 195.

Blair also argues in connection with Claim #9 that trial counsel was ineffective for failing to move to strike Count 9 under 18 U.S.C. § 1957, which prohibits knowingly engaging in a monetary transaction with criminally derived property of a value greater than $10,000.[11] *See* Pet'r's Mot. Vacate at 20, ECF No. 255. Blair was convicted of using drug proceeds to purchase two cashier's check for $10,000—a prohibited monetary transaction—which were used to secure counsel for Saunders and Bernard.  For the reasons previously stated, the Government without question sustained its burden to prove Blair's knowledge that the money came from an illegal drug enterprise.  Further, on appeal the Fourth Circuit found sufficient evidence in the record to affirm Blair's convictions under 18 U.S.C. § 1956(a) and § 1957.  Blair has given no reason to believe that a motion by counsel to strike Counts One through Nine for lack of knowledge that the money in the safe was illegal drug proceeds would have succeeded. As a result, the Court concludes that Blair's counsel acted well within the range of professional reasonableness by declining to make such a motion.

---

[10] During Nicely's testimony, she read a statement from Blair's opinion letter to her penned on November 4, 2003, in which Blair noted that, "[p]rior to meeting with me on November 4th, 2003, two of your family members, Richard Bernard and DaShawn Saunders, were allegedly charged with criminal conduct in Richmond, Virginia . . . Both of these persons were in need of attorneys. You requested my assistance with respect to legal services for these men." Trial Tr. at 16:19-24, Dec. 4, 2009, ECF No. 196. This was further evidence that Blair was aware that the money came from illegal activity.

[11] Under 18 U.S.C. § 1957(f)(1) "the term 'monetary transaction' . . . does not include any transaction necessary to preserve a person's right to representation as guaranteed by the sixth amendment to the Constitution." This represents a carve-out exception available to attorneys who receive funds from defendants as attorney's fees. Blair argues that Section 1957(f) applied to the conduct underlying Count Nine.

To the extent that Blair argues that trial counsel was deficient in not moving to strike Count 9 pursuant to the safe harbor provision in § 1957(f), this argument is addressed in connection with Claims #2 and #8 *infra*.

In <u>Claim #21</u>, Blair alleges that trial counsel was ineffective because he failed to establish a "critical fact" that would have undercut "the paramount element" required to convict Blair of Count Ten (Witness Tampering), in violation of 18 U.S.C. § 1512(b)(3). *See* Pet'r's Mot. Vacate at 36-37, ECF No. 255; Pet'r's Reply at 11-12, ECF No. 278. According to the facts accepted by the Fourth Circuit, Blair provided Nicely with a letter on November 13, 2003 that detailed the "partner money" story and supposedly explained why Nicely was involved in providing legal fees for Saunders and Bernard. *United States v. Blair*, 661 F.3d 755, 762 (4th Cir. 2011). Nicely was directed to memorize the letter for her interview with the FBI. *Id.* Based on the date Nicely was scheduled to speak with the FBI agent, and the date he wrote the letter, says Blair, Nicely could not have used this letter to "'rehearse' a lie to tell the FBI" because the letter did not exist when Nicely was scheduled to give a statement. *See* Pet'r's Mot. Vacate at 36-37, ECF No. 255. Thus, Blair alleges that Nicely "had a serious credibility problem" when she testified about the November 13, 2003 opinion letter penned by Blair and introduced by the Government as B&L 26. Pet'r's Mot. Vacate at 36, ECF No. 255. *See also* Trial Tr. at 12:14-20:14, Dec. 4, 2009, ECF No. 196. As a result, Blair claims that effective cross examination would have made Nicely's credibility problem sharply apparent. *See* Pet'r's Mot. Vacate at 36-37, ECF No. 255. The Government responds that there is no record to support that cross-examination on the topic would have successfully impeached Nicely. *See* Gov't Resp. Opp'n at 9, ECF No. 277.

Claim #21 evidences Blair's misunderstanding of the charges against him. For the purposes of Count Ten, the exact day and time his opinion letter to Nicely was created are immaterial. The

core criminal conduct underlying Count Ten was that Blair attempted to get a witness to manufacture testimony. The conduct was not limited Nicely's November 13, 2003 interview with the FBI and the date of the creation of the opinion letter. [12] *See* Superseding Indictment at 8, ECF No. 54 ("[o]n or about November 12, 2003"); Verdict Form at 3, ECF No. 165 (the jury was asked "as to COUNT TEN of the Indictment (witness tampering November, 2003 [no date specified]) how do you find the defendant WALTER LLOYD BLAIR?")

Even if the jury accepted Blair's contention that the physical letter did not exist at the time Nicely's call with the FBI was scheduled, that would in no way have detracted from the Government's theory that Blair fabricated a story and coached Nicely to repeat it in preparation for the phone call, or for use during her subpoenaed interview. Whether the fabricated story was memorialized in writing at some point, even whether the conversation with the FBI ever took place, is unimportant; the statute punishes even the *attempt* to knowingly "corruptly persuad[e]" a witness "to hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense." 18 U.S.C. § 1512(b)(3) (emphasis added).

This is not even a "long shot contention" on Blair's part and his trial counsel can in no way be faulted for failing to pursue it. *See United States v. Mason*, 74 F.3d 824, 830 (4th Cir. 2014) ("Courts have consistently made clear that we do not penalize attorneys for failing to bring novel or long-shot contentions").

In Claim #6, Blair argues that his trial attorney was ineffective by failing to establish that Blair received attorney's fees on November 5, 2003. Because, he suggests, Nicely did not receive a key to open the safe until the next day, i.e. on November 6, 2003, the money could not possibly

---

[12] At trial, Nicely did not specifically testify that she used the letter to rehearse testimony for her interview with FBI Agent Edward on November 13, 2003. The jury could have reasonably inferred, however, that the occasion on which she used it was when she went to Richmond later that month.

have come from the safe. *See* Pet'r's Mot. Vacate at 16-17, ECF No. 255. Blair concludes that, if counsel had raised this point, it would have further undermined Nicely's credibility on the matter of whether she paid him with drug money. *Id*. The Government argues that Blair's trial counsel might very well have concluded that the jury would have disbelieved Blair's alleged handwritten notation that his attorney's fees from Nicely were paid on November 5, 2003, in view of all the other evidence that corroborated Nicely's account. *See* Gov't Resp. Opp'n at 8 n.4, ECF No. 277.   The Court agrees.

Blair's assertion that he was paid attorney's fees on November 5, 2003, was very much at odds with the evidence in the record. Nicely and Henry met with Blair at his Silver Spring office on November 5, 2003, then, upon Blair's instruction, departed the office to try to open the safe. *See* Trial Tr. at 160:20-25, Dec. 3, 2009, ECF No. 195.   Nicely testified she did not gain access to the contents of the safe until the next day, November 6, 2003. *See* Trial Tr. at 161:1-3, Dec. 3, 2009, ECF No. 195.   Of particular significance, Nicely also testified that she signed her retainer agreement with Blair on November 6, 2003—before which it would have been highly unlikely for her to have paid any legal fees. *See* Trial Tr. at 176:18-179:2, Dec. 3, 2009, ECF No. 195. A printout obtained from Blair's office also indicates that Nicely met with Blair on November 6, 2003. *See* Trial Tr. at 95:1-10, Dec. 4, 2009, ECF No. 196.   Blair's claim of a November 5, 2003 payment, quite simply, is factually unsupported, even if marginally relevant.

In <u>Claim #13</u>, Blair alleges that both his trial and appellate counsel failed to establish a chronology that, if properly set out, would have impeached Nicely's testimony about the reason she sought Blair's legal advice. *See* Pet'r's Mot. Vacate at 24-25, ECF No. 255. First, he says, the true reason Nicely sought Blair's services was because, on or about October 30, 2003, she received a notice from the Drug Enforcement Administration regarding the Cadillac Escalade;

she did not contact him because she was concerned about the contents of the safe. *See* Pet'r's Mot. Vacate at 25, ECF No. 255. Blair also argues that Nicely falsely testified that the safe was in her basement, but when she and Blair first met in early November, the safe was in fact in storage. *Id.* According to Blair, had counsel established these points, Nicely would have been impeached, since Internal Revenue Service Special Agent Meredith Louden would have testified that Nicely received the DEA notice regarding the Escalade vehicle on October 30, 2003. *See* Pet'r's Mot. Vacate at 25, ECF No. 255; Pet'r's Reply at 30, ECF No. 278. The Government suggests that due to the fact that Nicely testified regarding the DEA notice before Agent Louden testified, Blair's counsel quite likely considered that the risk of recalling Nicely would have outweighed the highly uncertain benefit of potential impeachment testimony. *See* Gov't Resp. Opp'n at 8, ECF No. 277.

More fundamentally, Blair fails to explain how and why Nicely's original reason for consulting him is important to his case. Further, beyond a bare assertion of counsel's purported ineffectiveness, Claim #13 is devoid of any reference to prejudice that Blair suffered as a result of trial counsel's alleged deficiency.

For the same reasons, Blair has not shown how appellate counsel provided ineffective assistance based upon the grounds identified in Claim #13.

In Claim #14 Blair alleges that trial and appellate counsel were ineffective because they failed to properly establish a chronology as to Nicely's testimony regarding the dates the safe was removed from her possession. Blair alleges that Nicely lied with respect to the real reason she came to see him. The safe, he says, in fact had been removed from Nicely's basement and transferred to her sister's possession prior to November 4, the day Nicely first arrived in Blair's office.  *See* Pet'r's Mot. Vacate at 26, ECF No. 255; Pet'r's Reply at 10, ECF No. 278. This

chronology, Blair argues, would have established that it was impossible for Nicely to have retained Blair regarding the safe in her basement. *See id*. The Government, quite correctly, calls this claim out as meritless. *See* Gov't Resp. Opp'n at 9, ECF No. 277.

First, of course, to the extent Blair now makes his own assertions of fact to contradict Nicely's testimony as to chronology or any other aspect of the case, he lost his chance to do so when he did not take the stand at trial. Certainly he had every right not to testify at trial. But he cannot now be heard to say, this is what I would have said if I had testified. He points to no other evidence that supports his preferred chronology.

But Claim #14 lacks merit because Blair alleges no facts to support a finding that the point he urges would in any way have undermined the overall thrust of the Government's case. *See* Gov't Resp. Opp'n at 8-9, ECF No. 277. It was the Government's theory, supported by more than ample evidence, that in early November of 2003, Nicely was in possession of a safe filled with drug money and that at some point she brought that money to Blair, pursuant to his direction. *Id*. at 9.  Although Blair zeroes in on where the safe was located as of a particular time, it is ultimately of no consequence whether or when the safe was in Nicely's basement or in storage. Trial counsel's failure to highlight this fact could not, therefore, have been ineffective. A defendant is not prejudiced if the facts he cites are inconsequential to the Government's theory of criminal liability. *See Fisher v. Lee*, 215 F.3d 438, 447 (4th Cir. 2000) ("[I]t is insufficient for the defendant 'to show that the errors had some conceivable effect on the outcome of the proceeding,' because '[v]irtually every act or omission of counsel would meet that test.'" (quoting *Strickland*, 466 U.S. at 693)).

**Claims Related to Agent Razetti**

Internal Revenue Service Criminal Investigation Division Special Agent Judith Razetti was the affiant in support of the search warrant for Blair's law offices. She interviewed most of the Government's witnesses and was intimately familiar with the case. At trial, however, Agent Razetti was not called to testify.

Blair contends that trial counsel was constitutionally deficient by failing to call Agent Razetti as a witness because her testimony would have so undermined the testimony of Nicely that he would have been acquitted. *See* Pet'r's Mot. Vacate at 29, ECF No. 255; Pet'r's Reply at 18, ECF No. 278. Blair identifies multiple examples of what he asserts would have been valuable impeachment evidence which would have shown how Nicely's trial testimony departed significantly from statements she made to Agent Razetti. *See* Pet'r's Mot. Vacate at 27-32, ECF No. 255.

Thus, in <u>Claim #15</u>, Blair argues that Agent Razetti could have impeached Nicely on the matter of whether Nicely was present in Blair's office with Henry when Henry paid Blair's legal fees. *See* Pet'r's Mot. Vacate at 27-28, ECF No. 255; Pet'r's Reply at 18, ECF No. 278. According to Blair, Razetti wrote in her search warrant affidavit that Nicely was not present in his office. However, in her trial testimony, Nicely claimed that she was present with Henry at the time the money was paid. *See* Pet'r's Mot. Vacate at 27, ECF No. 255. <u>Claim #16</u> similarly alleges that Agent Razetti would have "destroyed" Nicely's credibility with regard to her testimony that she was present with Henry, because it would have shown that Nicely's testimony about money being paid to Blair, the counting of money, and the statements about drug money were false. *Id*. at 29. In <u>Claim #18</u>, Blair argues that Agent Razetti could have testified that it was Nicely's idea to purchase real estate, which would have "destroy[ed]" Nicely's credibility on

that fact. *Id*. at 32. In <u>Claim #32</u>, Blair also condemns appellate counsels' failure to raise the issue of trial counsel's failure to call Agent Razetti as a witness at trial. *Id*. at 52-53.

The Government submits that trial counsel had already ably impeached Nicely's credibility on cross examination, so that it was reasonable to assume that counsel decided that the costs of calling Razetti outweighed any benefits she might bring. *See* Gov't Resp. Opp'n at 11, ECF No. 277. The Court is in full agreement.

As to Claims #15, #16, and #18, the Court finds that Blair has failed to satisfy both prongs of *Strickland*.

Counsel's performance was not deficient. The record demonstrates that his decision not to call Agent Razetti to impeach Nicely was "well within the range of professionally reasonable judgments." *United States v. Phillips*, 974 F. Supp. 491, 496 (D. Md. 1997). Counsel may well have decided that the Government's cross examination of Agent Razetti would have strengthened the Government's case against Blair rather than aided in his defense, since Razetti's investigation was instrumental in building the Government's case against him in the first place. *See id*. ("The record shows that Phillips's counsel made a tactical decision not to call these witnesses because their testimony would have been harmful to the defense.") *see also Ashe v. United States*, No. CIV.A. DKC 04-3115, 2011 WL 1230830, at *2 (D. Md. Mar. 29, 2011) ("Ordinarily, tactical decisions such as which witnesses to call are 'virtually unchallengeable.'") (quoting *Powell v. Kelly*, 562 F.3d 656, 670 (4th Cir. 2009)).

Blair has also failed to satisfy *Strickland's* prejudice prong. The record in no way suggests that Agent Razetti's testimony would have resulted in a reasonable probability of a different outcome—i.e. actual prejudice to Blair. *See Satcher v. Pruett*, 126 F.3d 561, 572 (4th Cir. 1997) (observing that actual prejudice is demonstrated if the petitioner shows that the "error

worked to his 'actual and substantial disadvantage,' not merely that the error created a 'possibility of prejudice.'" (quoting *Murray v. Carrier*, 477 U.S. 478, 494 (1986)); *Poyner v. Murray*, 964 F.2d 1404, 1425 (4th Cir. 1992). The Government's evidence against Blair was overwhelming, he has not demonstrated that Agent Razetti's testimony would in any way have undermined Nicely's testimony to the point of rendering it unbelievable. Even if Nicely's testimony had been so impeached as to be disbelieved by the jury, there remained more than sufficient testimony from other witnesses as well as multiple documents that supported the Government's case.

Clearly then, as to Claim #32, Blair has also failed to demonstrate either prong under *Strickland* that appellate counsel were constitutionally deficient by failing to address the Agent Razetti issue on appeal. It is improper for a court "to second-guess the judgment of appellate counsel so as to impose a duty to raise every colorable claim." *Griffin v. Aiken*, 775 F.2d 1226, 1235 (4th Cir. 1985).

**Additional Claims of Ineffective Assistance**

In Claim #22, Blair alleges that both trial and appellate counsel were ineffective by failing to approach the bench after the Court allegedly "cut off" a defense witness, Walter Lee, Esquire.[13] Lee was apparently prepared to testify that Blair was not required to submit an IRS Form 8300, "Report of Cash Payments Over $10,000 Received in a Trade or Business."[14] *See* Pet'r's Mot. Vacate at 38, ECF No. 255. The Government argues that, insofar as it may have been relevant to the case (Blair was not charged with the crime of failing to file the form), the Court properly advised the jury that Blair was required to submit Form 8300 for any amount over $10,000, and

---

[13] Walter Lee was Blair's former law partner.
[14] Per Internal Revenue Service instructions, IRS Form 8300 is required to be filed when a business receives $10,000 in cash, in one large sum, during the ordinary course of business, from the same person, in a single transaction.

that in any case, ample trial testimony established that Blair in fact had received up to $170,000.

Attorney Lee was permitted to state that he and Blair "believed" they were not required to file

the Form, but beyond that, an opinion as to what the law actually required called for an

impermissible legal opinion. *See* Gov't Resp. Opp'n at 12, ECF No. 277.

The Court agrees with the Government. During the trial, at the bench out of the hearing of

the jury, the Court and counsel discussed at length the nature of Lee's proposed testimony,

specifically whether he should be permitted to give his opinion as to whether Blair was required

to file an 8300 form.  The Court indicated that Lee would not be permitted to testify as to what

the law did or did not require, but that he would be able to say what he believed the law required.

Thus, when asked by the Court, "[i]n your judgment, was [Blair] required to file [an 8300]?" Lee

responded in the negative. Trial Tr. at 60:22-61:3, Dec. 10, 2009, ECF No. 208. There the matter

ended. Blair is unable to overcome the strong presumption that trial counsel's decision not to

approach the bench to further pursue discussion of an issue the Court had already discussed at

the bench at length was clearly reasonable or "outside the wide range of professionally

competent assistance." *United States v. Fulks*, 683 F.3d 512, 517 (4th Cir. 2012) (quoting

*Strickland*, 466 U.S. at 690). The management of a case is within the purview of the trial

attorney. Courts "are reluctant to second-guess tactical decisions of counsel." *United States v.

Bland*, 23 F.3d 403, 1 (4th Cir. 1994). Beyond that, Blair has failed to demonstrate that he was

subjected to actual prejudice, given the essentially uncontroverted evidence that he received well

over the $10,000 amount that required him to submit a Form 8300.[15]

---

[15] When asked how much money Blair counted in his office, Henry responded, "I think the total was about $170,000." Trial Tr. at 90:3, Dec. 3, 2009, ECF No. 195. Henry also confirmed that Blair told him there was "170, 180,000?" Trial Tr. at 90:9-10, Dec. 3, 2009, ECF No. 195. During Vassel Clarke's testimony about Blair arriving with the duffle bag, Clarke testified, "I remember him saying 100,000, it was 100,000," that came out of the duffle bag. Trial Tr. at 24:16, Dec. 7, 2009, ECF No. 197.

In <u>Claim #11</u>, Blair argues that trial counsel was ineffective when he failed to move for dismissal of Count Nine, which charged him with knowingly engaging in a monetary transaction in criminally derived property valued at greater than $10,000. This, says Blair, is because the amount he says he retained ($9,880), fell below the statutory threshold of 18 U.S.C. § 1957(a).[16] *See* Pet'r's Mot. Vacate at 22, ECF No. 255; Pet'r's Reply at 34, ECF No. 278. The Government suggests that the amount Blair retained as attorney fees was immaterial to Count Nine because the conduct underlying the Count concerned the $20,000 in bank checks he obtained to pay for legal representation of the Virginia defendants. *See* Gov't Resp. Opp'n at 12 n.8, ECF No. 277.

The Superseding Indictment puts the matter to rest. It alleges that Blair violated Section 1957(a) in that he "knowingly engaged and attempted to engage in a monetary transaction in and affecting interstate commerce in criminally derived property that was of a value greater than $10,000 and was derived from specified unlawful activity, that is, conspiracy to distribute narcotics and distribution of narcotics under 21 U.S.C. §§ 846 and 841, by purchasing bank checks numbered 4968008206 and 4968008208 at SunTrust Bank, a financial institution, totaling $20,000." Superseding Indictment at 7, ECF No. 54. The amount Blair personally received, even if $9,880, was therefore irrelevant to Count Nine. Since Count Nine related specifically to Blair's purchase of two bank checks of $20,000,  it was reasonable for trial counsel not to put forth Blair's argument because "[c]ounsel is not required to engage in the filing of futile motions." *Sharpe v. Bell*, 593 F.3d 372, 383 (4th Cir. 2010) (quoting *Moody v. Polk*, 408 F.3d 141, 151 (4th Cir. 2005)); s*ee also Proctor v. United States*, 729 F. Supp. 473, 476 (D. Md. 1990), *aff'd sub nom. Epps v. United States*, 911 F.2d 721 (4th Cir. 1990) (holding "[p]rofessional standards of criminal defense advocacy do not require counsel to present frivolous arguments.")

---

[16] An individual violates Section 1957(a) if he "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity…" 18 U.S.C. § 1957(a).

In Claim #17, Blair argues that even though prior to trial the Court ruled that his CPA, R.S. Dasai ("Dasai"), could not testify, the Government elicited testimony from other witnesses that made Dasai's testimony necessary to explain Blair's defense theory to the jury. *See* Pet'r's Mot. Vacate at 30-31, ECF No. 255. The Government notes that the Court considered the request to call Dasai multiple times, and denied the request of Blair's counsel each time. *See* Gov't Resp. Opp'n at 12, ECF No. 277.

Blair alleges now that trial counsel never attempted to ask the Court to reconsider its earlier disallowance of Dasai's testimony.  *See* Pet'r's Mot. Vacate at 31, ECF No. 255. But the record clearly belies this. Blair's counsel most assuredly did argue for the inclusion of Dasai's testimony, and the Court denied that request more than once. *See* Trial Tr. at 33:4-5, 45:9-56:17, Dec. 9, 2009, ECF No. 198. Blair's claim of ineffective assistance of counsel on these grounds is unsustainable because "[defense counsel] made the very argument that [the defendant] claims he did not make." *Marshall v. United States*, 461 F. Supp. 2d 388, 396 (D. Md. 2006), *subsequent mandamus proceeding sub nom. In re Marshall*, 283 F. App'x 148 (4th Cir. 2008). Though framed as an ineffective assistance of counsel claim, Claim 17 "[a]t its core, . . . simply disapproves of the trial judge's ruling." *Green v. French*, 978 F. Supp. 242, 255 (E.D.N.C. 1997), *aff'd*, 143 F.3d 865 (4th Cir. 1998).

In Claim #24, Blair attacks trial counsel's failure to move for acquittal or request special jury instructions with respect to Count Thirteen (Willful Failure to File Personal Income Tax Return for 2002 under 18 U.S.C. § 2603) because of the "erroneous suggestion" that the money Blair received from Nicely should have been included on his income return for that year. Pet'r's Mot. Vacate at 41, ECF No. 255; Pet'r's Reply at 27-28, ECF No. 278. The Government points out that even if Blair had never received any money from Nicely, he still would not have escaped

criminal liability under 26 U.S.C. § 2603, *see* Gov't Resp. Opp'n at 13-14, ECF No. 277, which is concerned with a binary inquiry – whether the defendant did or did not willfully fail to file an income return.[17]

Any money Blair received from Nicely, as attorney's fees or otherwise, is unimportant under this statute. As the Court of Appeals has already explained, "[t]he unreported income that triggered Blair's obligation to file did not flow from the money laundering activities that commenced in 2003." *United States v. Blair*, 661 F.3d 755, 769 (4th Cir. 2011). Regardless of what money he may have received from Nicely, Blair was required by law to file tax returns and he failed to do so.  Trial counsel, therefore, was not ineffective for not moving for dismissal of Count Thirteen or not requesting special jury instructions on the specific grounds alleged in Claim #24 because "[p]rofessional standards of criminal defense advocacy do not require counsel to present frivolous arguments." *Proctor v. United States*, 729 F. Supp. 473, 476 (D. Md. 1990), *aff'd sub nom. Epps v. United States*, 911 F.2d 721 (4th Cir. 1990). *See also Almon v. United States*, 302 F. Supp. 2d 575, 586 (D.S.C. 2004) ("There can be no ineffective assistance of counsel for failing to raise a claim which is not legally viable.") (citations omitted).

In Claim #8, Blair argues that trial counsel was ineffective for twice failing to argue for his acquittal under the safe harbor provision of Section 1957(f)(1), noting that the jury was only aware of the safe harbor because the Government submitted that possible defense via jury instructions. *See* Pet'r's Mot. Vacate at 18-19, ECF No. 255.  Under Count 9, Blair was convicted of violating 18 U.S.C. § 1957, which prohibits knowingly engaging in a monetary transaction with criminally derived property of a value greater than $10,000. Verdict Form at 3,

---

[17] The elements of the crime are: "(1) that the defendant was required by law to file a tax return for the year in question, (2) that he failed to timely file such tax return, and (3) that the failure was a willful failure." *United States v. Justin*, 450 F. App'x 304, 304 (4th Cir. 2011) (quoting *United States v. Ostendorff*, 371 F.2d 729, 730 (4th Cir. 1967)).

ECF No. 165. The activity underlying this conviction was Blair's use of drug proceeds from Nicely to purchase two cashier's checks for $10,000 each—a prohibited monetary transaction— which were used to secure counsel for Saunders and Bernard. The safe harbor provision under § 1957(f) exempts from the definition of "monetary transaction" "any transaction necessary to preserve a person's right to representation as guaranteed by the sixth amendment to the Constitution." 18 U.S.C. § 1957(f)(1).

But, in fact, Blair's trial counsel did address the safe harbor provision of Section 1957(f) in his Motion for Judgment of Acquittal made after the defense rested and prior to jury instructions. *See* Trial Tr. at 3:2-4:9, 8:6-9:18, Dec. 11, 2009, ECF No. 201 (arguing that "the plain language of 1957(f)(1) clearly exempts criminally derived proceeds used to secure legal representation to which an accused is entitled under the Sixth Amendment . . .We're saying that all of these [nine counts]. . . there was no knowing concealment."). The Court considered the arguments of both the Government and the defense and ultimately rejected the arguments advanced by the defense. *Id.* at 15. And, Blair's counsel at sentencing[18] made another Rule 29 Motion at sentencing, arguing that Count 9 should be dismissed under the Section 1957(f)(1) exemption, which the Court also denied. Sentencing Tr. at 20:14-30:12, Mar. 17, 2010, ECF No. 209; Order, ECF No. 191. In other words, both trial and appellate counsel "made the very argument that [Blair] claims they did not make. [Blair], therefore, cannot sustain this claim of ineffective assistance of counsel." *Marshall v. United States*, 461 F. Supp. 2d 388, 396 (D. Md. 2006), *subsequent mandamus proceeding sub nom. In re Marshall*, 283 F. App'x 148 (4th Cir. 2008).

Indeed, appellate counsel pursued this issue on appeal, but the Fourth Circuit ultimately held that the exemption protecting defense counsel from prosecution under Section 1957 did not

_____

[18] Messrs. Robinson and Kirchman, who also represented Blair on appeal.

apply to Blair.  The court found that, while "Sixth Amendment rights are at bottom *personal* to the accused," Blair's conduct "was far beyond the scope of the Sixth Amendment" because he "us[ed] someone else's money, [and] Blair hired counsel not for himself, but for others." *United States v. Blair*, 661 F.3d 755, 772 (4th Cir. 2011).  That said, Blair has failed to demonstrate that he was prejudiced because he has not shown there was a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.[19]

Blair's Claim #2 amounts to a repetition of Claim #8 in that Blair urges that his own legal services on behalf of Nicely were exempt from prosecution for engaging in monetary transactions in property derived from specific unlawful activity, 18 U.S.C. § 1957, by reason of the safe harbor of Section 1957(f)(1). *See* Pet'r's Mot. Vacate at 9-11, ECF No. 255. Blair believes both trial and appellate counsel were ineffective for not making the argument that the exemption applied to Blair's representation of Nicely, as opposed to the payments Blair made to the two attorneys for Saunders and Bernard in Virginia. *Id*.  However, the conduct under Count 9 that was the basis for the conviction under Section 1957 was limited to Blair's purchase of the two cashier's checks for $10,000 to secure counsel for Saunders and Bernard.  Because Blair's legal services for Nicely were not the basis of his conviction under Section 1957, neither trial nor appellate counsel was deficient in failing to argue that Nicely's payments to him were exempt. Claim #2, like Claim #8, fails to persuade.

In Claim #1, Blair argues that it was ineffective assistance for trial counsel not to introduce the contents of Blair's client file for Nicely, including Blair's handwritten notes dated 11/4/03 and the names and phone numbers of Virginia criminal defense attorneys. *See* Pet'r's

---

[19] For the same reason, the Court rejects Blair's argument in Claim #9, claiming that trial counsel was ineffective in failing to move to strike Count 9 based on the safe harbor provision in 18 U.S.C. § 1957(f)(1).  *See* Pet'r's Mot. Vacate at 20, ECF No. 255.

Mot. Vacate at 7-8, ECF No. 255. According to Blair, introducing Nicely's client file and his handwritten notes would have undermined Nicely's version of events, specifically as to the date Nicely contacted Blair, and the reason she contacted him. *Id*. The Government argues that trial counsel was not ineffective in this regard because introducing the handwritten records of Blair would have put a spotlight on the inconsistencies between what Blair (who, again, did not testify) believes was the chronology of the case, and the directly contradictory testimony of several other witnesses. Assuming Blair's counsel could have successfully gained admission for Blair's notes, including the self-serving portions—a questionable proposition—the jury might well have been disposed to disbelieve the authenticity of the notes in any case. *See* Gov't Resp. Opp'n at 12-13, ECF No. 277.

Again, Blair cannot overcome the "strong presumption" that trial counsel's decision not to introduce Blair's handwritten notes was "sound trial strategy," falling "within the wide range of reasonable professional assistance." *Lewis v. Wheeler*, 609 F.3d 291, 312 (4th Cir. 2010) (citing *Strickland*, 466 U.S. at 689). In any case, the only difference between Nicely's testimony and Blair's handwritten notes appears to be that the latter omitted any mention of Nicely asking Blair to assist her in disposing of what she told Blair was drug money. *See* Pet'r's Mot. Vacate at 8, ECF No. 255. Nor can Blair satisfy the prejudice prong of *Strickland*. Since the utility of the evidence in question was marginal at best, there is no "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

In Claim #10, Blair alleges that both trial and appellate counsel were ineffective because of their respective failures to point out that Blair did not receive sufficient proceeds to satisfy elements of Counts One through Eight, given that "proceeds" are defined as "net profits" under

*United States v. Santos*, 553 U.S. 507 (2008), a case in which the Supreme Court addressed the merger problem. *See* Pet'r's Mot. Vacate at 21-22, ECF No. 255; Pet'r's Reply at 21-24, ECF No. 278. Blair relies on *United States v. Cloud*, 680 F.3d 396 (4th Cir. 2012), which explains the merger problem as follows: "An individual cannot be convicted of money laundering for paying the 'essential expenses of operating' the underlying crime." *Id.* at 406 (quoting *United States v. Halstead*, 634 F.3d 270, 279 (4th Cir. 2011). However, the Government points out that these cases did not apply here because there was simply no merger problem: Blair did not use the money he received from Nicely in furtherance of the illegal activity that gave rise to the funds (i.e. marijuana dealing), nor was he charged with that offense. *See* Gov't Resp. Opp'n at 14, ECF No. 277.

This is not a case in which the defendant "pays for the costs of a crime with its proceeds," *Santos*, 553 U.S. at 516, such as where "'the felon … uses the stolen money to pay for the rented getaway car" or "the initial recipient of the wealth" in "any wealth-acquiring crime with multiple participants ... gives his confederates their shares.'" *Cloud*, 680 F.3d at 406 (quoting *Santos,* 553 U.S. at 516 (plurality opinion)). Blair did not use the drug money he received from Nicely to pay for the costs of drug trafficking; instead, he laundered the money in other, separate transactions, including the purchase of Nicely's real estate and paying the legal fees of Saunders and Bernard. Thus, Blair's counsel was not required to argue that Blair did not receive sufficient proceeds under the merger problem because, again, "[p]rofessional standards of criminal defense advocacy do not require counsel to present frivolous arguments." *Proctor v. United States*, 729 F. Supp. 473, 476 (D. Md. 1990), *aff'd sub nom. Epps v. United States*, 911 F.2d 721 (4th Cir. 1990).

In <u>Claim #23</u>, Blair argues that trial counsel was ineffective (as were sentencing and appellate counsel for not raising trial counsel's failure) by failing to argue during trial that the jury was required to find as facts any and all elements of the crime that might affect the measure of his punishment at sentencing. *See* Pet'r's Mot. Vacate at 39-40, ECF No. 255. He points specifically to the ten-level enhancement of his offense level under the Sentencing Guidelines that was based on the amount of money he was given by Nicely ($170,000), a fact he believes should have been decided by the jury. *Id.* To this effect Blair cites *Alleyne v. United States*, 133 S. Ct. 2151 (2013), which held that any fact that may increase the mandatory minimum sentence is considered an element that must be submitted to the jury, and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), holding the same with respect to facts affecting the statutory mandatory maximum.[20]

The Government counters that Blair did not face a mandatory minimum sentence, and that the enhancements in his case in no way affected the statutory mandatory maximum.

The Court agrees with the Government that *Alleyne* and *Apprendi* do not apply. What is being challenged here is an enhancement under the Sentencing Guidelines, not a mandatory minimum or mandatory maximum sentence. As such, it would not have been appropriate for trial counsel to ask for a special finding from the jury on the matter of how guideline enhancements might be calculated for sentencing purposes.

The Government further argues there was more than sufficient testimony from both Nicely and Henry that established the amount of money involved as $170,000, well within the

---

[20] Blair also challenges the 6-level increase in his offense level for his "alleged knowledge that Nicely's money used to pay Blair was from marijuana sales," and any and all other increases in his offense level on the grounds that they were "facts" not found by a jury. Pet'r's Mot. to Vacate at 39-40, ECF No. 255. As the Court is about to observe, however, these were not facts that required a jury finding. *See* n.16, *supra*.

range of a ten level enhancement.[21] *See* Gov't Resp. Opp'n at 16, ECF No. 277. On the basis of this testimony, says the Government, the Court could easily have concluded by a preponderance of the evidence that the ten level enhancement applied. *Id.*

The preponderance of the evidence standard applies to resolving factual disputes at sentencing. *United States v. Steadman*, 198 F. Supp. 2d 730, 735 (E.D. Va. 2002) (citing *McMillan v. Pennsylvania*, 477 U.S. 79, 91, 106 S. Ct. 2411 (1986)). The Court therefore agrees with the Government that there was more than adequate evidence in the record for the Court to find, by a preponderance of the evidence, that the amount of drug money Blair received was $170,000.[22] *See* Presentence Report at 15; *See* Statement of Reasons at 1 April 29, 2010, ECF No. 205 (adopting factual findings of PSR without objection). Under the circumstances, there was no particular reason for counsel to challenge this amount. In any case, the Court finds no reason to conclude that sentencing counsel's failure to act was prejudicial to Blair.

In Claim #25, Blair makes a similar argument, *viz.* that trial counsel was ineffective by failing to seek an instruction which would have required the jury to find the specific amount of money Blair received from Nicely—e.g. $77,000, $130,000, or $170,000. *See* Pet'r's Mot. Vacate at 42-43, ECF No. 255. Without such an instruction, Blair says, the Pre-Sentence Report amount of $170,000 he was found to have received remained undisputed, which unfairly—he believes—served as the basis for the ten level enhancement of his offense level under the Sentencing Guidelines. *See* Pet'r's Mot. Vacate at 42-43, ECF No. 255; *see also* U.S.S.G. § 2B1.1(b)(F). Blair contends that if the jury had found that only $77,000 was involved, the

---

[21] The ten-level enhancement applied because the amount of money involved was between $120,000 and $200,000. U.S.S.G. § 2B1.1(b)(1)(F).

[22] When asked how much money Blair counted in his office, Henry responded, "I think the total was about $170,000." Trial Tr. at 90:3, Dec. 3, 2009, ECF No. 195. Henry also confirmed that Blair told him there was "170, 180,000?" Trial Tr. at 90:9-10, Dec. 3, 2009, ECF No. 195. During Vassel Clarke's testimony about Blair arriving with the duffle bag, Clarke testified, "I remember him saying 100,000, it was 100,000," that came out of the duffle bag. Trial Tr. at 24:16, Dec. 7, 2009, ECF No. 197.

enhancement level would only have been increased by six instead of ten levels, resulting in a Total Offense Level of 26 not 30 and a correspondingly lower imprisonment range.

Again, however, *Alleyne* and *Apprendi* do not apply in this case, and the record fully justified a finding that Blair received up to $170,000, well within the range for a 10-level enhancement in his offense level.

In <u>Claim #20</u>, Blair argues that trial counsel was ineffective for failing to request (and appellate counsel were subsequently ineffective for failing to fault trial counsel for failing to request) four specific jury instructions which Blair says resulted in his conviction. *See* Pet'r's Mot. Vacate at 35, ECF No. 255. The four jury instructions pertained to: (1) the amount of money paid by Henry and Nicely to Blair in November 2003, *viz.* whether it was $77,000, $130,000, or $170,000; (2) whether Blair knew the source of Nicely's money was from marijuana distribution; (3) whether Nicely retained Blair because of the criminal exposure she faced or out of fear for her own safety because she had Rankine's safe in her basement; and (4) what the "net profit" was, if any, Blair received as "proceeds" under Counts One through Eight under 18 U.S.C. § 1956 and Count Nine under 18 U.S.C. § 1957. *See* Pet'r's Mot. Vacate at 35, ECF No. 255.

This claim founders on both prongs of *Strickland.* Counsel was neither deficient nor was Blair in any way prejudiced. Since none of the instructions were warranted, counsel can hardly be faulted for not having requested them. The requested instructions were either irrelevant or were otherwise subsumed in instructions that were given.

The first suggested jury instruction, referring to the specific amount of money paid to Blair by Nicely and Henry was essentially covered by the jury verdict form, which read: "As to COUNT ONE of the Indictment (money laundering – November 6, 2003 transfer of more than

-36-

$70,000 in currency from Nicely to defendant BLAIR), how do you find the defendant WALTER LLOYD BLAIR? _Guilty or _Not Guilty" Verdict Form at 1, ECF No 165. The several amounts Blair suggests ($77,000/$130,000/$170,000) would have been immaterial since the minimal amount he himself suggests exceeds $70,000. "Failure to raise a meritless argument can never amount to ineffective assistance." *Moore v. United States*, 934 F. Supp. 724, 731 (E.D. Va. 1996).

The second jury instruction Blair urges, *viz.* whether he knew the source of Nicely's money was marijuana, as the Government points out, was clearly subsumed in the Court's instruction as to the *mens rea* requirement in connection with Counts One through Nine. *See* Gov't Resp. Opp'n at 15, ECF No. 277. As previously discussed in connection with Claim #9, *supra*, the statute under which Blair was convicted required only that a defendant know that the money represented the proceeds of some unlawful activity. 18 U.S.C. § 1956(a)(1)(B)(i); 18 U.S.C. § 1957(a). The Government did not have to prove that Blair knew the specific type of illegal transaction from which the money was derived. The jury received an appropriate instruction in this regard.

Blair's third proposed jury instruction is plainly irrelevant. For purposes of the charges Blair faced, it was and is unimportant *why* Nicely came to his office. His convictions turned on *what* Blair's conduct consisted of subsequent to receiving a potential client, *viz.*, Nicely, who possessed a large amount of suspicious money she had been storing for a recently slain drug dealer. Blair has not shown to a reasonable probability that a jury finding as to the specific reason Nicely came to his office would have occasioned a different outcome in the case. *See* Gov't Resp. Opp'n at 15, ECF No. 277.

The fourth jury instruction Blair says counsel should have requested is also irrelevant. Because his reliance on the merger rule is misplaced, as explained in regards to Claim #10, it would have been immaterial to for the jury to consider the extent to which his net profit constituted "proceeds."

In sum, all of Blair's claims pertinent to jury instructions he contends counsel should have requested "fail to meet the *Strickland* test because he alleges no facts from which prejudice could be inferred." *Goins v. Angelone*, 52 F. Supp. 2d 638, 665 (E.D. Va. 1999) (citing *Strickland*, 466 U.S. at 692-696).

In Claim #12, Blair asserts that trial counsel was generally ineffective by failing to properly impeach the Government's witnesses because counsel declined to use hundreds of direct and cross examination questions Blair himself prepared. *See* Pet'r's Mot. Vacate at 23-24, ECF No. 255. The Government argues that there is no authority to the effect that an attorney's rejection of his client's proposed questions to witnesses *ipso facto* amounts to ineffective assistance of counsel. *See* Gov't Resp. Opp'n at 11-12, ECF No. 277. The Court is in accord with the Government.

It is well established that "[a] criminal defense attorney is obligated to follow his client's wishes only with regard to the fundamental issues that must be personally decided by the client." *United States v. Chapman*, 593 F.3d 365, 369 (4th Cir. 2010). "Fundamental issues" have been limited to the decisions "whether to plead guilty, waive a jury, [have the defendant] testify in his or her own behalf, or take an appeal." *United States v. Chapman*, 593 F.3d 365, 368 (4th Cir. 2010) (quoting *Jones v. Barnes,* 463 U.S. 745, 751(1983)). Questions asked during the examination of a witness do not constitute fundamental issues. Formulating specific examination questions is matter of trial tactics, within the exclusive purview of the defense attorney. *See*

*Mosley v. United States*, No. CIV. DKC 07-1520, 2011 WL 1230888, at *2 (D. Md. Mar. 29, 2011) ("As an initial matter, tactical decisions such as what questions to ask of witnesses are "virtually unchallengeable.") (citing *Powell v. Kelly*, 562 F.3d 656, 670 (4th Cir. 2009)). *See e.g. United States v. Jackson*, 546 F.3d 801, 814 (7th Cir. 2008) ("[Deciding] what questions to ask a prosecution witness on cross-examination is a matter of strategy.") (citations omitted). The tactical decisions made by Blair's trial counsel are afforded great deference. He cannot overcome the "strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

## IV.

### Claims Specific to Appellate Counsel

In Claim #26, Blair argues that appellate counsel were ineffective because they did not raise all the arguments comprising Claims #1 through #25. *See* Pet'r's Mot. Vacate at 43-44, ECF No. 255. The Government rejects this proposition out of hand. *See* Gov't Resp. Opp'n at 16 n.13, ECF No. 277.

The answer, of course, is straightforward. Since the Court has just found all of Blair's claims of ineffectiveness of his trial counsel to be meritless, appellate counsel's performance cannot be deemed to have been sub-standard for failing to raise those claims on appeal. As the Supreme Court has observed, "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Jones v. Barnes*, 463 U.S. 745, 751-52, (1983). Blair's appellate counsel focused on five issues they believed had the greatest merit, some of which, in fact, did incorporate aspects of at least some of the 25 claims of ineffective assistance Blair has raised in relation to trial counsel.

Appellate counsel raised these five arguments:

First: That 18 U.S.C. § 1957 exempts from prosecution transactions necessary to preserve a person's right to representation as guaranteed by the Sixth Amendment.

Appellate counsel argued that the trial court erred when it denied Blair's motion to dismiss Count Nine, the basis of which was his purchase of two bank checks used to pay counsel for the two defendants in Virginia. Br. for Appellant at 20, *United States v. Blair*, 661 F.3d 755 (4th Cir. 2011).

Second: That the trial court erroneously denied Blair's Motion to Sever Counts Thirteen and Fourteen (failure to file income tax returns) from Counts One through Twelve. Br. for Appellant at 20, *United States v. Blair*, 661 F.3d 755 (4th Cir. 2011).

Counsel argued that the joinder was improper and that Blair was entitled to a new trial. Br. for Appellant at 20, *United States v. Blair*, 661 F.3d 755 (4th Cir. 2011).

Third: That there was insufficient evidence to convict Blair of Count Eleven (Obstruction of Justice) in connection with his application for *pro hac vice* admission the U.S. District Court for the Eastern District of Virginia to assist in the representation of the Virginia defendants. Br. for Appellant at 21, *United States v. Blair* 661 F.3d 755 (4th Cir. 2011).

Fourth: That there was insufficient evidence to convict Blair of money laundering when there was no proof of specific intent on his part to conceal the nature, source or ownership of the money and where the whole "monetary transaction" was merely a duffle bag of money handed from one individual to another. Br. for Appellant at 21, *United States v. Blair*, 661 F.3d 755 (4th Cir. 2011).

Fifth: That there was insufficient evidence to convict Blair of aiding and abetting money laundering because the money in question had already been laundered, and the transaction at

issue amounted to no more than merely spending this previously laundered money. Br. for Appellant at 21, *United States v. Blair*, 661 F.3d 755 (4th Cir. 2011).

Insofar as Blair challenges the issues appellate counsel did make, the Court finds that it was fairly within appellate counsel's professional judgment that raising five potentially meritorious claims rather than twenty or more arguably meritless and often repetitious claims was the proper way to frame the appeal. *See Jones v. Barnes*, 463 U.S. 745, 753 (1983) ("A brief that raises every colorable issue runs the risk of burying good arguments."); *Griffin v. Aiken*, 775 F.2d 1226, 1235 (4th Cir. 1985) ("[I]t is not proper for us to second-guess the judgment of appellate counsel so as to impose a duty to raise every colorable claim.")

The reality is that as to none of these issues did appellate counsel prevail. That, of course, hardly demonstrates counsel's ineffectiveness. Among all the possible issues in the case, appellate counsel's decision to focus on these five can by no means be judged constitutionally deficient.

In Claim #27, Blair argues that appellate counsel were ineffective by failing to hold a single meeting with him. *See* Pet'r's Mot. Vacate at 45, ECF No. 255. The Government submits that Blair has failed to point to any case law supporting the proposition that ineffective assistance of counsel is *ipso facto* established when an appellate attorney fails to meet with the client. *See* Gov't Resp. Opp'n at 12 n.7, ECF No. 277. As clearly stated by the Fourth Circuit, there is no established "minimum number of meetings between counsel and client prior to trial necessary to prepare an attorney to provide effective assistance of counsel." *Moody v. Polk*, 408 F.3d 141, 148 (4th Cir. 2005) (quoting *United States v. Olson*, 846 F.2d 1103, 1108 (7th Cir. 1988)). Blair has not shown in the least what possible difference a face-to-face meeting with counsel might have made. Accordingly, he fails to prove the first prong of the *Strickland* standard, i.e. that his

counsel's performance was deficient.  Of equal import, Blair has not demonstrated how appellate counsel's failure to visit him resulted in prejudice, such that there was a reasonably probability that the outcome of the appeal would have been different.

In Claim #28, Blair argues that it was appellate counsel's failure to visit him that caused them to state on oral argument that the money he received from Nicely and Henry was not simply attorney's fees—whereas Blair asserts now that in fact that was what the money was. *See* Pet'r's Mot. Vacate at 46, ECF No. 255; Pet'r's Reply at 45, ECF No. 278. The Government submits that the facts established at trial showed that, while at least some of the money Blair received was accepted as attorney's fees, the totality of the funds delivered to him were never meant to be, nor were they all used for, attorney's fees. *See* Gov't Resp. Opp'n at 17, ECF No. 277.

Before all else, the Court finds, that there is no evidence in the record upon which appellate counsel could have argued that all the money Blair received was in fact accepted as attorney's fees. Blair himself did not testify. As previously recounted, the only record evidence as to the nature of the payment was directly to the contrary to what Blair now submits. The fact that appellate counsel did not argue to the appeals court that Blair received all the money as attorney's fees cannot therefore be deemed constitutionally infirm.

Blair's second argument under Claim #28 is that allowing Attorney Kirchman—who in Blair's opinion was "ineffective"—to argue the appeal rather than having the more experienced Attorney Robinson argue the appeal violated the terms of his retainer agreement with them. *See* Pet'r's Mot. Vacate at 46-47, ECF No. 255; Pet'r's Reply at 48, ECF No. 278. The retainer agreement—not in the record, by the way—may well have contained provisions as to which attorney would do what. But whatever the retainer agreement might have provided, the

Government says, the breach of a retainer agreement is not cognizable as an ineffective assistance of counsel claim. *See* Gov't Resp. Opp'n at 17, ECF No. 277. The Government is correct.

No case law suggests that a lawyer with limited experience is *ipso facto* ineffective for Sixth Amendment purposes.  While "[t]he character of a particular lawyer's experience may shed light in an evaluation of his actual performance . . . it does not justify a presumption of ineffectiveness in the absence of such an evaluation." *United States v. Cronic*, 466 U.S. 648, 665 (1984). Even if Blair's Section 2255 Motion to Vacate were an appropriate vehicle to address this particular grievance, the decision as to which attorney would argue his appeal would still amount to a tactical decision that rested with appellate counsel. *See United States v. Chapman*, 593 F.3d 365, 370 (4th Cir. 2010) (likening the attorney-client relationship to that of agent-principal but distinguishing that while "a principal generally has the authority to dictate the manner in which his agent will carry out his duties, the law places certain tactical decisions solely in the hands of the criminal defense attorney.")  Finally, the Court would note that, while an alleged violation of the retainer agreement does not evidence unconstitutionally deficient performance by counsel, Blair, within the period of limitations at any rate, was always free to bring a civil suit for breach of contract.

In Claim #29, Blair argues that, because appellate counsel did not use research that Blair himself had undertaken, they failed to comprehend that the money he returned to Nicely in November 2003 in fact represented unearned attorney's fees. *See* Pet'r's Mot. Vacate at 48, ECF No. 255; Pet'r's Reply at 49-50, ECF No. 278. The Government notes that Blair has not cited to the record nor explained the legal significance of this particular argument. *See* Gov't Resp. Opp'n at 18, ECF No. 277.

The Court finds that Blair's counsel were not obliged to use his research because the decision to use any particular research would have been a "tactical one left to the sound judgment of counsel." *United States v. Chapman*, 593 F.3d 365, 369 (4th Cir. 2010). Tactical decisions "fall[s] within the wide range of reasonable professional assistance." *Strickland v. Washington*, 466 U.S. 668, 689 (1984).

In <u>Claim #30</u>, Blair alleges that Attorney Kirchman was ineffective because he promised success on the merits with respect to his arguments pertaining to the Section 1957(f) exemption. He submits that Kirchman's only reason for doing this was to have Blair pony up a $50,000 retainer, whereas after the fact Kirchman expressed the opinion that "he never really believed Blair or his defense." *See* Pet'r's Mot. Vacate at 49, ECF No. 255. According to Blair, this negative attitude amounted to ineffectiveness of counsel because it pervaded the entirety of appellate counsel's representation. *See* Pet'r's Mot. Vacate at 49, ECF No. 255; Pet'r's Reply at 48-49, ECF No. 278. The Government suggests that imprecise assertions such as this do not state a claim of ineffective assistance of counsel, s*ee* Gov't Resp. Opp'n at 17 n.14, ECF No. 277, a proposition with which the Court agrees.

But there is a more precise answer to Blair's argument.

The Constitution does not guarantee a defendant an attorney who "believes" him to be innocent or an attorney who is obligated to deliver on an alleged promise of a specific positive outcome. Instead, "[t]he Sixth Amendment . . . envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results." *Strickland v. Washington*, 466 U.S. 668, 685 (1984).  Kirchman, it may be noted, was in fact successful in securing at least one vote from the divided 3-judge Fourth Circuit panel as to Blair's interpretation of Section 1957(f)(1).  Inasmuch as that was the case, the Court cannot agree that Kirchman made anything

like a "legal misrepresentation" to Blair, even if he promised greater success on the argument than he ultimately achieved. *See* Pet'r's Mot. Vacate at 49, ECF No. 255. Moreover, as the Government observes, Blair himself was a practicing criminal defense attorney and as such was uniquely qualified to make an independent professional judgment as to the strength of any appellate argument relating to the Section 1957(f)(1) exemption. *See* Gov't Resp. Opp'n at 17, ECF No. 277. In other words, given his own professional background as a criminal defense attorney, Blair was in a unique position to recognize "puffing" by Kirchman, if indeed that was what Kirchman was engaged in. Not only does Blair fail to convince the Court that Kirchman's purported "overpromising" or his unspoken personal skepticism with respect to Blair's defense "undermined the proper functioning of the adversarial process," *Strickland*, 466 U.S. at 686; he fails to explain how he suffered actual prejudice in consequence of what Kirchman might have believed or said.

In Claim #31, Blair presents seven arguments he believes appellate counsel should have raised but did not.  He complains that, pursuant to its mandate rule, the Fourth Circuit declined to consider arguments that Blair himself attempted to raise on his second appeal, following his resentencing after the Fourth Circuit vacated his conviction on Count 11, obstruction of justice. *See* Pet'r's Mot. Vacate at 50-52, ECF No. 255; Pet'r's Reply at 50-51, ECF No. 278. For this, Blair faults counsel on his first appeal.

The Fourth Circuit's mandate rule precludes "relitigation of issues expressly or impliedly decided by the appellate court," and "litigation of issues decided by the district court but foregone on appeal." *United States v. Bell*, 5 F.3d 64, 66 (4th Cir. 1993).  Blair is correct that, on his second (*pro se*) appeal, the Fourth Circuit determined that the "all of his challenges to his convictions and the majority of his sentencing issues are foreclosed by the mandate rule."

*United States v. Blair*, 508 F. App'x 225, 225 (4th Cir. 2013). That meant that, at his resentencing, Blair was limited to a determination of the appropriate sentence after his conviction for Count 11 was vacated. He was not entitled to directly challenge any other of his convictions either at resentencing.

In several of his claims under <u>Claim #31</u>, Blair tries to end-run the Fourth Circuit's ruling on his second appeal that the claims were foreclosed by the mandate rule and attempts to make the claims notwithstanding. But in no event does he explain how appellate counsel in his first appeal were deficient in making or not making those arguments.  For example, he questions whether the "4th Circuit's Panel unjustly used the Mandate Rule"; he requests review of whether his "convictions for money laundering for paying the 'essential expenses' of operating the underlying crime . . . satisfied the exception to the Mandate Rule [that] . . . controlling legal authority has changed dramatically"; and he asks whether Supreme Court's guidance is required on the circuit "split" following the Fourth Circuit's interpretation of 18 U.S.C. § 1957(f)(1) in his first appeal—a proposition, arguably at least, already rejected by the Supreme Court when it denied both of his petitions for certiorari.  *See* Pet'r's Mot. Vacate at 51, ECF No. 255.   Blair also challenges this Court's calculation at resentencing of his guideline range under the U.S. Sentencing Guidelines, as to which the Fourth Circuit explicitly held: "we find no clear error in the application of those adjustments." *United States v. Blair*, 508 F. App'x 225, 225-26 (4th Cir. 2013).

Finally, Blair challenges this Court's actions at *resentencing*, at which Blair represented himself, since he believes that "no admissible evidence exists to support a finding of 'drug money' in a safe," and that "Nicely and Henry did not have personal knowledge about any 'drug money.'" *See* Pet'r's Mot. Vacate at 51, ECF No. 255.

This is more than a little odd.

This is a § 2255 Motion predicated essentially on allegations of ineffective assistance of counsel. It is not an occasion to re-argue issues already decided or as to which argument has been foreclosed. Insofar as Blair has served as his own attorney, he can hardly be allowed to argue his own missteps as ineffectiveness of counsel claims. In any case, with regard to trial and appellate counsel, when he had them, they did in fact challenge the sufficiency of the evidence to support the jury verdict as to several counts. But, as the Fourth Circuit concluded, "[b]ecause our review of the record convinces us that the evidence was sufficient, we reject this argument." *United States v. Blair*, 661 F.3d 755, 764 (4th Cir. 2011).

As to these last purported claims, the door – quite simply – is closed.

## V.

### Other Motions

#### A.  Motion for Discovery

As a supplement to his Motion to Vacate, Blair has moved for discovery, requesting leave of court to conduct depositions that will "support materially the allegations of movant Blair as to the 'performance' of counsel." Pet'r's Mot. Disc. at 2, ECF No. 256.

A "habeas petitioner  . . . is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997).  The court may grant discovery under Rule 6 of the Rules Governing § 2255 Proceedings if "good cause" is shown.  Good cause is shown if the petitioner makes "specific allegations [that] show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief."  *Bracy*, 520 U.S. at 908-09 (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)); *Quesinberry v. Taylor*, 162 F.3d 273, 279 (4th Cir. 1998) (noting that *Bracy* adopts the *Harris* standard); "'[G]ood cause' for

discovery exists when a petition for habeas corpus establishes a prima facie case for relief." *United States v. Roane*, 378 F.3d 382, 403 (4th Cir. 2004). On the other hand, a defendant may not use discovery to go on a "fishing expedition" through the Government's files in search of evidence to support imagined and fanciful claims. *See United States v. Wilson*, 901 F.2d 378, 381 (4th Cir. 1990). Once good cause has been shown, the scope and extent of discovery is left to discretion of the district court. *Bracy*, 520 U.S. at 909.

The Court concludes, given its previously extensive review of Blair's multiple claims, that he has failed to give reason to believe that, if the facts are fully developed, he might be entitled to relief. His Motion for Discovery is therefore **DENIED**.

B.  Motion for Witnesses to Appear at Evidentiary Hearing & Motion for 48 hour Furlough
to Appear or to Appear via TV Monitor

Blair has also requested an evidentiary hearing on his Motion to Vacate, as to which he requests the following witnesses to appear: Special Agent Judith Razetti, former AUSA Jonathan Su and former AUSA Michael Pauze (to "bring a copy of "any subpoena or notice or letter regarding . . . Blair's intent to subpoena [Razetti]" in 2009), as well as counsel who represented him at trial, David William, and on appeal, Eric Kirchman, and Ken Robinson (to "bring a copy of [their] entire file concerning client [Blair]"). See Pet'r's Mot. Witn. Appear Evid. Hr'g at 1-2, ECF No. 257. Blair further asks the Court to grant him a 48 hour furlough to appear at the hearing in person or by means of TV monitor. *See* Pet'r's Mot. Furlough at 1, ECF No. 258.

Again, the Court concludes that a comprehensive review of Blair's Motion to Vacate conclusively shows he is entitled to no relief. *See* 28 U.S.C. § 2255(b). Blair has failed to present "a colorable Sixth Amendment claim showing disputed facts beyond the record or [that] a credibility determination is necessary in order to resolve the issue." *United States v. Blondeau*,

480 F. App'x 241, 242 (4th Cir. 2012) (citing *United States v. Witherspoon*, 231 F.3d 923, 925-27 (4th Cir. 2000)).

Accordingly, his Motion for an Evidentiary Hearing, ECF No. 257, and Motion for a 48 Hour Furlough to Appear or to Appear via TV Monitor, (ECF No. 258), are both **DENIED**.

## VI.

### Conclusion

Summing Up:

Blair's Motion for Relief Under 28 U.S.C. § 2255, ECF No. 255, is **DENIED**.

His Motion for Discovery, ECF No. 256, is **DENIED**.

His Motion for an Evidentiary Hearing, ECF No. 257, and Motion for a 48 Hour Furlough to Appear or to Appear via TV Monitor, ECF No. 258, are both **DENIED**.

## VII.

### Certificate of Appealability

Rule II(a) of the Rules Governing § 2255 Proceedings provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."   A certificate of appealability will not issue absent "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see Slack v. McDaniel*, 529 U.S. 473, 474 (2000); *Miller-El v. Cockrell,* 537 U.S. 322, 336 (2003).  A prisoner satisfies this standard by "demonstrat[ing] that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," and that any dispositive procedural ruling by the district court is likewise debatable.  *Miller-El*, 537 U.S. at 338 (quoting *Slack*, 529 U.S. at 484). The Court has considered the entire record in the case and finds that Blair has not made the requisite showing here.

The Certificate of Appealability is **DENIED.**

A separate order will **ISSUE.**


_____/s/_____

**PETER J. MESSITTE**
**UNITED STATES DISTRICT JUDGE**

**November 4, 2016**